OPINION
{¶ 1} Cynthia A. Bizjak appeals from the judgment of the Lake County Court of Common Pleas, Domestic Relations Division, which granted the parties a divorce. We affirm in part and reverse in part.
 {¶ 2} Cynthia and David Bizjak were married on October 27, 1989. David filed a complaint for divorce on May 15, 2000. Cynthia filed a separate complaint for divorce. The cases were subsequently consolidated. Cynthia was awarded temporary custody of the parties' minor children. David was ordered to pay child support and make monthly payments on the first mortgage on the marital residence. The court also ordered that the existing health care coverage on the parties and children not be cancelled.
 {¶ 3} Trial in this matter began on October 29, 2001 and continued on October 30, 2001, January 30, 2002, February 1, 2002, March 26, 2002, and March 27, 2002. During trial, the parties agreed to a shared parenting plan. The parties also entered into an agreement as to the disposition of personal property. Further, the parties entered into the record fifteen joint stipulations relating primarily to the purchase, financing, and refinancing of the marital residence.
 {¶ 4} The magistrate entered his decision on December 16, 2002. After the grant of several extensions of time, the parties both filed objections to the magistrate's decision. The trial court heard the objection and entered an order on December 23, 2003, ruling on the objections. The final judgment entry of divorce was entered on April 23, 2004. Cynthia filed a timely appeal from this judgment raising three assignments of error:
 {¶ 5} "[1.] The trial court erred to the prejudice of defendant appellant granting appellee plaintiff appreciation on his separate interest without considering the impact refinancing and equity loans had on this separate contribution."
 {¶ 6} "[2.] The trial court erred to the prejudice of defendant appellant when it rendered judgment against appellant in the amount of $2,304.08 plus interest from a case transferred from the general division of the Lake County Court of Common Pleas."
 {¶ 7} "[3.] The trial court erred to the prejudice of the appellant when it refused to hold a hearing and render a decision on appellant's motion filed April 10, 2003 which alleged appellee unilaterally terminated appellant's health insurance and appellee failed to pay the first mortgage as ordered by the trial court on July 21, 2000."
 {¶ 8} In her first assignment of error, Cynthia argues the trial court's judgment finding a portion of the appreciation of the marital residence was David's separate property was against the manifest weight of the evidence. Essentially, Cynthia argues David failed to present evidence to trace his separate interest in the appreciation in the marital residence. We agree, albeit for different reasons than advanced by Cynthia. While Cynthia's brief raises the traceability issue generally, she focuses her argument on the effect the various re-financings had on the value of the home. However, a review of the record makes clear David failed to present evidence to establish what appreciation was passive, and what appreciation was due to improvements made to the property, i.e., active.
 {¶ 9} The evidence established the following facts: Prior to the marriage David owned real estate located on Cricket Lane, which he sold. The parties purchased the marital residence on Salida Road in June 1990. The Salida Road home was purchased for $155,000. The purchase was financed by a first mortgage of $116,000. A down payment of $40,620 was made. David contributed the down payment from the proceeds of the sale of the Cricket Lane property, i.e., the down payment was David's separate property. David and Cynthia owned the Salida Road home jointly and both signed the mortgage. In April 1997, the parties took out a $25,000 equity line of credit on the home, primarily for the purchase on April 30, 1997 of a Jeep for $19,117.21. In April 1998, the parties paid off the first mortgage and equity line by refinancing the house with a new mortgage of $129,800. This mortgage was at a lower interest rate of 6.6%. The balance on the first mortgage at the time of refinancing was $106,975.95 and the balance on the equity line was $18,477.82. The reduction in the first mortgage from the date of original purchase to the time of trial was $13,852. In November 1999, the parties established a new equity line of credit in the amount of $87,000. At the time of trial, the parties stipulated the value of the home was $300,000. The record also establishes various improvements were made to the property over the course of the marriage.
 {¶ 10} We will uphold a trial court's characterization of property as separate or marital when the record contains some competent credible evidence to support the trial court's conclusion. Boyles v. Boyles, 11th Dist. No. 2002-P-0097,2003-Ohio-5351, ¶ 18.
 {¶ 11} In the instant case, there is no dispute that the $40,620 down payment was David's separate property. This issue is whether David presented evidence to establish what increase in the value of the property was passive, rather than active. Traceability becomes the focus in determining whether separate property has lost its character after being commingled with marital property. Peck v. Peck (1994), 96 Ohio App.3d 731, 734. The party seeking to establish an asset as separate property has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property. Id.; Bugos v. Bugos (Oct. 15, 1999), 11th Dist. No. 98-T-0141, 1999 Ohio App. LEXIS 4875, at 9.
 {¶ 12} Passive appreciation, which is an increase in the fair market value of the home due to its location or inflation, is separate property. R.C. 3105.171(A)(6)(a); Boyles, supra at ¶ 41. On the other hand, an increase in the fair market value of property that is due to either spouse's efforts, monetary, labor, or in-kind [i.e., active appreciation], is marital property. Id. Moreover, "[a]ll that is required for a determination that appreciation is marital property for purposes of equitable distribution is that either party contributed to an increase in the value of separate property during the life of the marriage."Polakoff v. Polakoff (Aug. 4, 2000), 11th Dist. No. 98-T-0163, 2000 Ohio App. LEXIS 3542, at 15. (Emphasis sic.) We have also held that a party who fails to provide adequate evidence as to the amount of passive appreciation fails to meet his burden of tracing the appreciation as separate property, because we are unwilling to speculate when the evidence is devoid of a cause
for the increase. McLeod v. McLeod, 11th Dist. No. 2000-L-197, 2002-Ohio-3710, at ¶ 31.
 {¶ 13} The final trial commenced on October 29, 2001, and continued on January 28, 2002, January 30, 2002, February 1, 2002, March 26, 2002, and March 27, 2002. The parties submitted their written closing arguments in April 2002. On October 30, 2002, the trial court opened the case for an additional day of evidence. The magistrate stated that, "because of new case requirements, we needed additional evidence on * * * [the] computation of passive appreciation of husband's and wife's separate interest in the marital residence, if any * * *."
 {¶ 14} Even though the magistrate gave the parties an additional day to present evidence, seven months after the case was completed, David still did not introduce evidence on how much improvements made to the home over the course of the marriage increased the value of the home versus how much the value increased due to location or inflation. In fact, a review of the record reveals David spent the entire time simply repeating what the parties stipulated to, what he already testified to, and what he included in his written, closing arguments.
 {¶ 15} In the magistrate's decision on December 13, 2002, he stated, "[a]ll we have in the record are [appellee's] amateur estimations as to increased value because of location and improvements made during the years. While [I] offered the parties an opportunity to present evidence to the same, neither party produced any evidence regarding the appreciation of the marital residence."
 {¶ 16} A careful look at the evidence (or "appellee's amateur estimations") reveals that it is scant as to the cause of fair market value increase. David, when asked his opinion as to what caused the residence to increase in value, replied he thought it was due to "the money put into it as well as the securing of the erosion on the beach, the money we put into the beach area to secure the foothold on the bank." When further asked his opinion as to how much of the increase was "just from being lakefront property," he responded, "$50,000 or $60,000." At the final evidence hearing, David testified he was entitled to sixty percent of the appreciation. When asked by the magistrate "how do you arrive at 60% of the increase in value, * * * 40,000 of the 155,000 is not 60 percent," David responded, "$40,000 plus * * * the inheritance * * * [went] into [increasing] the value * * * [of] the home to help it appraise at the $300,000."
 {¶ 17} "Ohio courts have long recognized the `owner-opinion rule' which allows the owner of real estate or real property to estimate the value of such property since the owner is assumed to possess sufficient knowledge of its value." Boyles, supra at ¶ 31. However, "[a]ppellant's] testimony regarding the possible growth of his down payment to $[145,000] at the date of trial is not sufficient to warrant a finding of passive appreciation on his original down payment." Slomcheck v. Slomcheck, 11th Dist. No. 2001-T-0098, 2002-Ohio-4952, at ¶ 13.[1] An owner cannot simply speculate how much, for example, adding a deck increased the value of the home, how much remodeling the kitchen did, how much securing the foothold on the bank of lakefront property did, versus how much the value increased simply by being lakefront property.[2] See Sterbencz v. Sterbencz, 9th Dist. No. 21865, 2004-Ohio-4577 (holding that expert testimony is required where appreciation is due both to market forces and to improvements) and Mansell v. Mansell, 5th Dist. No. 02CA52, 2003-Ohio-4643 (analysis comparing expert appraisal testimony on market forces and improvement).
 {¶ 18} After seven days of trial, spread over the course of one year, the magistrate found the parties jointly made improvements to the home, and as such, they were marital property. See Middendorf v. Middendorf, 82 Ohio St.3d 397, 400,1998-Ohio-403; McLeod, supra. Further, the magistrate rejected David's formula for determining appreciation on his separate interest, finding the evidence was inadequate to prove David had a separate interest in the appreciation. The magistrate then awarded David his separate down payment of $40,620 and ordered the parties to divide equally the remaining marital equity.
 {¶ 19} After an objection hearing on May 13, 2003, the trial court issued its ruling on the objections on December 23, 2003. The trial judge rejected the foregoing findings and sustained David's objections stating "[David's] down payment of $40,620.00 from separate funds is clearly traceable[.]" That fact was not in contention. However, whether David adequately traced the appreciation on that down payment was at issue. Yet, the trial court never discussed tracing that down payment to the amount of appreciation in the home at the time of the divorce. Instead, the trial court used the formula set forth in Munroe v. Munroe
(1997), 119 Ohio App.3d 530, and awarded David an additional $87,348 in appreciation, without considering whether David met his burden of tracing the asset to his separate property. This was error and contrary to law.
 {¶ 20} Even if David had presented evidence to trace the amount of passive appreciation (versus active appreciation), we would find the trial court erred in applying the Munroe
formula. In a similar case, Bugos v. Bugos (Oct. 15, 1999), 11th Dist. No. 98-T-0141, 1999 Ohio App. LEXIS 4875 at 10-11, we distinguished Munroe. In Bugos, as here, the issue was "what additional portion of the current equity should be considered property of appellant versus marital property to be divided[.]"
 {¶ 21} In Bugos, after the parties decided to marry, they purchased a home. The husband provided the down payment, which was separate premarital property. The parties later took out a second mortgage on the home, both designated as mortgagors. We upheld the trial court awarding the husband his initial down payment and equally dividing the remaining equity. We held the husband had not met his burden of tracing the equity as his separate property, stating that, "the record before us demonstrates that improvements were made to the home, even though the record is devoid of exactly what improvements were done[,]" although both parties had testified that some improvements were done. We distinguished Munroe because in that case, the husband had purchased the home, moved in, and then proposed marriage to his wife. In Bugos, we concluded that, "the decision to purchase the residence was a joint decision[,] * * * [and that] the appreciation * * * was not passive, that inferentially it was, in part, the result of improvements during coverture, * * *." Id. We also noted that both parties signed the purchase agreement and were jointly liable on the second mortgage.
 {¶ 22} In this case, the parties jointly purchased a home, with both parties liable on the mortgage. David provided the initial down payment, which is his separate property. Both parties testified to improvements to the home, although the evidence is devoid as to how the improvements raised the value of the home. The parties took out a second mortgage on the home, as well as an equity line of credit, both being liable for the debt. Just as the husband in Bugos failed to meet his burden and adequately trace the appreciation as his separate property, David, here, failed to meet his burden as well.
 {¶ 23} Furthermore, in Munroe, the court bypassed the traceability analysis. It is fundamental that a court must determine, first, whether a party has met his burden in tracing the property as separate, before deciding how to divide the property. In Munroe, the court stated the law regarding traceability, but then simply stated, without reference to any fact or evidence, that "[i]t is a matter of economic certainty that some of the current enhanced market value of the home was traceable to the original down payment twenty-one years earlier." That may be true; however, courts should not simply conclude, without any evidence, that some of the appreciation must be passive. The party claiming the appreciation is due to "enhanced market value" must prove it first.
 {¶ 24} Cynthia's first assignment of error has merit.
 {¶ 25} In her second assignment of error, Cynthia argues the trial court erred in ordering her to pay the costs of reproduction of video tapes subpoenaed by her counsel.
 {¶ 26} During the course of these proceedings, Cynthia's counsel learned David had had "nanny cams" installed in the marital residence to record Cynthia's activities. The Cefaratti Investigation Group had installed the cameras. Cynthia's counsel issued a subpoena for the reproduction of these video tapes. Cynthia's counsel later learned it would cost between $1,700 and $2,200 to reproduce the tapes and attempted to cancel the copying of the tapes. The Cefaratti Group subsequently filed suit in the general division court against her counsel to recover the cost of reproducing the tapes. In the instant case, the trial court ordered Cynthia to reimburse The Cefaratti Group for the cost of reproduction. The trial court erred in doing so.
 {¶ 27} The final divorce hearing in this case began October 29, 2001. After the trial was completed, and after objections were heard, Judge Lucci of the Lake County Court of Common Pleas, General Division, transferred Case No. 01CV001562, CefarattiInvestigations v. Ulrich, to the Domestic Relations Division. On May 16, 2003, the General Division's docket reflects that, "the court finds that allocation of the Cefaratti invoice of $2304.08, plus interest at the rate of 10% per annum from October 15, 2000, be left to the sound discretion of Judge Falkowski."
 {¶ 28} The General Division did not transfer the case to the Domestic Relations Division until after the final divorce trial had ended. The final hearing was on October 30, 2002. The objections' hearing was on May 13, 2003. According to its docket, the General Division transferred the case on May 16, 2003. The Domestic Relations Division's docket is devoid of any reference to the General Division case being transferred to it. In fact, a review of the record reveals that no reference was made with regard to Cefaratti, by the Domestic Relations Court, until that court ordered Cynthia to pay Cefaratt's invoice in its December 23, 2003 judgment entry. A review of the transcript reveals that Cefaratti was mentioned one time. On March 26, 2002, David's counsel asked appellant whether she requested, through her attorney, to have certain videotapes slowed down and produced for her review. Cynthia responded that she did not do that.
 {¶ 29} It is axiomatic that before a court can issue a judgment against a litigant for money damages, it must have jurisdiction over the litigant. Lincoln Tavern, Inc. v. Snader
(1956), 165 Ohio St. 61, 64. A trial court lacks jurisdiction to render judgment if effective service of process had not been made on a litigant and the litigant had not appeared in the case or waived service. Bowling v. Grange Mut. Cas. Co., 10th Dist. No. 05AP-51, 2005-Ohio-5924, at ¶ 27, citing Rite Rug Co., Inc. v.Wilson (1995), 106 Ohio App.3d 59, 62. The jurisdictional rules were enacted, in part, to ensure that minimum due process requirements are met. It is elementary that, at a minimum, due process of law requires notice and an opportunity to be heard.Mathews v. Eldridge (1976), 424 U.S. 319, 333.
 {¶ 30} On May 16, 2003, the General Division docket reflects that, "[t]he court finds that allocation of the Cefaratti invoice of $2,304.08, plus interest at the rate of 10% per annum from Oct. 15, 2000, be left to the sound discretion of Judge Falkowski." In the December 23, 2003 judgment entry (ruling on objections), after Judge Falkowski ordered appellant to pay Cefaratti, she notes, "[a] copy of this Order shall be sent to Judge Lucci for case number 01CV001562." Furthermore, in the final judgment entry of divorce, filed on April 23, 2004, Judge Falkowski again notes that, "[a] copy of this order shall be forwarded to the Honorable Eugene Lucci, Judge of the Common Pleas Court, Civil Division, referencing Case No. 01-CV-001562.
 {¶ 31} Judge Lucci, upon receiving the December 23, 2003 judgment entry, dismissed the case in the General Division. On January 28, 2004, the docket reflects that, "[a]s a result of the foregoing ruling of Judge Falkowski on Dec 23, 2003[,] in which she ordered Cynthia Bizjak to pay Cefaratti Investigation its invoice total of $2304.08 plus interest thereafter at the rate of (10%) per annum, it appears there are no further issues to be decided by this court the complaint and amended complaint are dismissed." Thus, it is clear that without Judge Lucci's referral to Judge Falkowski, she never would have ordered Cynthia to pay the invoice. Judge Falkowski, in effect, by ordering her to pay the Cefaratti invoice as "costs" in the divorce, ordered her to pay a judgment in a case to which she was not a party. This was clearly error since it violated Cynthia's due process rights.
 {¶ 32} Even if the court had the authority to order Cynthia to pay these costs, the court still erred because it failed to hold a hearing on the matter and afford Cynthia the opportunity to be heard on this issue.
 {¶ 33} Appellant's second assignment of error has merit.
 {¶ 34} In her final assignment of error, Cynthia argues the trial court erred when it failed to hear or rule on her April 10, 2003 motion to show cause for failure to maintain health insurance, failure to pay child support, and failure to pay mortgage. In support of her argument, Cynthia cites this court's holding in Stychno v. Stychno (May 29, 1992), 11th Dist. No. 91-T-4576, 1992 Ohio App. LEXIS 2783, where we dismissed an appeal for lack of a final appealable order because the lower court had not ruled on pending motions before entering its judgment.
 {¶ 35} Our holding in Stychno is inapposite to this case because the trial court's final judgment entry here dismissed all pending motions. Thus, unlike Stychno, the trial court in the instant case did explicitly consider the pending motions; it simply determined they should be dismissed.
 {¶ 36} Thus, unlike Stychno, the trial court in the instant case did consider the pending motions; it simply determined they should be dismissed.
 {¶ 37} Finally, we note that Stychno appears to be an anomaly. No other court has followed its holding that the failure to rule on a pending motion renders an otherwise final appealable order not final and appealable. The general rule is that when a trial court fails to rule on a pending motion prior to entry of final judgment, it is presumed the motion was overruled. See, e.g., Physiatrist Associates of Youngstown, Inc. v. Saffold,
11th Dist. No. 2003-T-0038, 2004-Ohio-2793, ¶ 18 ("All motions not ruled on are presumed to be overruled."); Brown v. Brown
(Dec. 26, 2001), 4th Dist. No. 01CA2, 2001 Ohio App. LEXIS 6068, 17, ("`As a general rule, a motion that is outstanding at the time judgment is entered in presumed to have been overruled.'") (Internal citations omitted.); Dooley v. Dooley (Aug. 7, 1998), 1st Dist. No. C-970616, 1998 Ohio App. LEXIS 3620, 6-7, ("When a trial court fails to rule upon a motion, it is presumed to be overruled. * * * We find no error in the failure to make explicit rulings."); Ogrizek v. Ogrizek (May 14, 1997), 9th Dist. No. 18074, 1997 Ohio App. LEXIS 2029, ("When a trial court fails to rule upon a motion, it will be presumed that it was overruled. * * * Thus, we may presume the court considered [appellant's] motion, and by its silence, denied [it].")
 {¶ 38} Here, even if the trial court failed to rule on the April 10, 2003 motion, we presume it was overruled. Cynthia fails to make any argument as to why the court erred in overruling the motion, i.e., her argument is directed at the procedural failure rather than a substantive error. Therefore, Cynthia's third assignment of error is without merit.
 {¶ 39} For the foregoing reasons, appellant's first assignment and second assignments of error have merit; appellant's third assignment of error is without merit. The judgment of the Lake County Court of Common Pleas, Domestic Relations Division, is affirmed in part and reversed in part, and this matter is remanded for proceedings consistent with this opinion.
Ford, P.J., Grendell, J., concur.
[1] The bracketed amount here of $145,000 is the amount of appreciation in this case, replacing $70,000, which was the amount of appreciation in Slomcheck on the original down payment of $20,155.
[2] All of the improvements listed in this paragraph are actual improvements the parties performed on this home, which the magistrate determined to be marital property.